## Rachel S. Rogers *vs.* W. L. Barker and others

The 3d subdivision of section 14 of the act concerning boards of health, confers upon those boards the power to make regulations for the suppression and removal of nuisances, and must be construed to have reference to that class of nuisances which can be the subject of regulation.

Neither a dam, thrown across a stream, nor a collection of water in a reservoir created thereby, is a nuisance *per se.* The question of nuisance or no nuisance depends upon the presence or absence of various extraneous facts and circumstances. And it is proper that the existence of those facts and circumstances, and the question of nuisance, should be referred to the common law trial by jury ; instead of being determined by a board of health, and property being summarily destroyed by its order, without compensation to the owner, and without an opportunity being given to him to be heard.

The legislature never designed to commit that unusual measure of power to the boards of health.

The rights of property, of every description, are qualified and restricted by the rule that they shall be so exercised as not to injure others. *Sic utere tuo ut alienum non lædas* is of universal application. But except in great and imminent emergencies the fact that they are injurious to others must be first established by the usual and customary proceedings of a trial in a competent court, before they can be taken away or destroyed.

Even if the power exists in boards of health to order property to be destroyed on the ground of its being a nuisance, and can be applied to the removal and destruction of a mill dam and a valuable water power used for manufacturing purposes, it is a power which must be exercised in subordination to the judicial authority of the state, and subject to be suspended and held in abeyance by the order of a court having jurisdiction of the subject, whenever the principal facts upon which its exercise depends are put in controversy and rendered doubtful, until they are established by due process of law.

If a board of health has authority and jurisdiction to determine the question of nuisance, and to order the suppression and removal of a dam as such, they should be required to state, in their adjudication, what the nuisance is — whether the dam itself, or the waters collected above the dam, and if the latter, how much of the structure shall be removed in order to dissipate and disperse the waters; and especially should the order or adjudication designate the particular dam or obstruction which they design shall be taken away.

Where a board of health, by resolution, declared and adjudged that the damming of the water in a particular river was " a dangerous nuisance, and detrimental to the health of the inhabitants," and then adjudged that all such nuisances be removed within three days ; it was *held* that this was too vague, indefinite and uncertain to authorize the removal of a mill dam thrown across the river, by means of which the waters had been applied as a power for driving machinery, for more than sixty years.

Rogers *v.* Barker.

APPEAL by the defendants from an order made at a special term, granting an injunction against the defendants, according to the prayer of the complaint.   The injunction enjoined and restrained the defendants from proceeding or acting upon certain resolutions passed by them as the board of health of the town of Mamaroneck, on the 24th of October, 1859, for the removal of nuisances in the Mamaroneck river caused by damming the waters thereof, and from injuring or in any way interfering with the property, lands, or real estate of the plaintiff or any part thereof, or disturbing her dam in or across the said river, or attempting in any way to reduce the amount of water in her mill pond.

*J. W. Tompkins,* for the plaintiff.

*W. C. Noyes,* for the defendants.

*By the Court,* BROWN, J.   No question was raised upon the argument as to the case made by the plaintiff being a proper one for an injunction, provided she was entitled to the use and enjoyment of the waters of the Mamaroneck river, and to maintain a dam therein in the manner described in her complaint.   The water privileges are of great value, and are actually applied to the uses of the manufacturing business. The threatened action of the defendants aimed at nothing short of their total destruction.   The injury would therefore have been continuous and irreparable, and if the complainant had a right to any relief from the court it was by the process of injunction, to restrain the defendants from removing the dam until the right to maintain it could be considered and finally determined.

At the time the agreement of the 12th June, 1854, between Cleveland, Potter and Smith of the first part, and Jackson, Tompkins, Oliver, Shepherd and Palmer of the second part, was made, the former were the owners in fee of the premises embracing the mill dam and premises, with the right to flow

Rogers *v.* Barker.

with water the lands covered by the mill pond, subject, however, to the lien of the mortgage made by William Minott Mitchell and wife to Maria Banyer and Ann Say. It was entirely competent for them to enter into the agreement with the parties of the second part to that instrument, to take down the dam and to suffer the waters of the stream to flow downward without obstruction. They could bind themselves to the observance of any covenant of the kind, and all those who claimed title under them. But this was the extent of their powers. They could not bind the holders of the mortgage made to Maria Banyer and Ann Say, by a former owner, and long before Cleveland, Potter and Smith acquired any title, nor those who claim title under the mortgage. This is the condition of the plaintiff, Rachel S. Rogers. She holds by title acquired under the mortgage, and thus her right is paramount to that of Cleveland, Potter and Smith, and to that of any person who claims from them. The contracting parties, Jackson, Oliver, Tompkins, Shepherd and Palmer, saw all this at the time, for simultaneously with the execution of the agreement they took back to themselves from Cleveland, Potter and Smith a bond in the penal sum of $11,000—just double the sum paid for the right to remove the dam and suffer the water to flow without interruption—conditioned to pay back the purchase money with the interest, in the event of any purchaser under a foreclosure of the mortgage restoring the dam and obstructing the free passage of the waters of the river. The agreement, therefore, and every thing which has been done under it, must be laid aside and not enter into the consideration of the question involved in the appeal.

So, too, with regard to the indictment found by the grand jury of the county of Westchester, in October, 1853. The dam then upon the premises was therein presented as a nuisance. The persons charged with maintaining it pleaded not guilty, and there the proceeding ended, except that a *nolle prosequi* was entered by the district attorney on the 19th of September, 1854. If this indictment could be regarded in any other light

Rogers v. Barker.

than one of the initiatory measures towards trying the question of nuisance, the question would still occur, what was the condition of these waters, and their effect upon the surrounding population, in October, 1853, when the old dam was in existence, and what was their condition and effect on the 24th October, 1859, the time when the defendants' resolution was adopted? That resolution, and the proceedings contemplated under it, had reference to the state of things at the time last named, and not to the condition of things six years previous thereto. What was a nuisance in 1853, in the opinion of the grand jury, may have become entirely inoffensive in 1859, after the erection of the new dam. The fact of the indictment being found cannot affect the present question.

The defendants justify their action, and claim the power to take down the plaintiff's dam, by virtue of their powers as the board of health of the town of Mamaroneck. The defendant William L. Barker is the supervisor, and the defendants Edward Seaman, William L. Carpenter and Isaac C. Taylor are the justices of the peace of that town. They assembled together on the 24th of October, 1859, and adopted a resolution constituting themselves a board of health for the town of Mamaroneck, and by another resolution they appointed the defendant Joseph Hoffman health officer of the board. Being thus constituted, they thereupon adopted another resolution, in the words following: "Resolved, that in the opinion of this board the damming of the water in Mamaroneck river is a dangerous nuisance, and detrimental to the health of the inhabitants of the town of Mamaroneck, and by authority vested in this board do hereby order and determine the removal within three days from the date of this notice all such nuisances." Notice of these proceedings, with a copy of the resolution or order of removal, the board immediately caused to be served upon the plaintiff. It may be safely taken for granted, I think, that the sole purpose of these proceedings is the removal of the plaintiff's dam and the discharge of the waters from the pond or reservoir which supplies and furnishes the power to

the plaintiff's factory and mill upon the stream. This is certainly a most novel and extraordinary proceeding. In an action for the abatement of a private nuisance placed in the bed of a running stream, by which the waters are flooded upon the lands of other owners above, the judgment of the court would necessarily define with exactness and precision the identical obstruction which caused the nuisance, and the manner and extent to which it is to be reduced, so as to enable the officer to execute the judgment according to its exigency. With less certainty and precision than this, a judgment rendered in an action of nuisance would be incapable of execution. In the present case the resolution does not define what the obstruction is, nor what it is not. It does not declare how, or in what manner, it has become detrimental to the health of the inhabitants of the town, nor how much the obstruction is to be reduced in order to abate its dangerous and deleterious consequences. Surely, if this board of health have authority and jurisdiction to determine this fact of nuisance and to order its suppression and removal, they should be required to state in their adjudication what the nuisance is—whether the dam itself or the waters collected above the dam, and if the latter how much of the structure shall be removed in order to dissipate and disperse the obnoxious waters; and especially should the order or adjudication designate the particular dam or obstruction which they design shall be taken away. The board, however, have thought it right in this instance to execute such powers as they have by declaring and adjudging that " the damming of the water in Mamaroneck river is a dangerous nuisance, and detrimental to the health of the inhabitants," and then adjudging that all such nuisances be removed within three days from the date of the order of removal. The rights of property do not, certainly, depend upon proceedings so vague, indefinite and uncertain as these.

The authority for this action of the board of health of the town of Mamaroneck is thought to be found in the 3d subdivision of section 14 of the act concerning boards of health,

(1 *R. S.* 851, 4*th ed.*) which empowers these boards " to make regulations in their discretion concerning the place and mode of quarantine ; the examination and purification of vessels, boats and other craft not under quarantine ; the treatment of vessels, articles or persons thereof; the regulation of intercourse with infected places ; the apprehension, separation and treatment of emigrants and other persons who shall have been exposed to any infectious or contagious disease ; the suppression and removal of nuisances ; and all such other regulations as they shall think necessary and proper for the preservation of the public health." "A nuisance is that which worketh hurt, inconvenience or damage." (3 *Black. Com.* 216.) Common nuisances are a species of offenses against the public order and economical regimen of the state, being either the doing of a thing to the annoyance of the king's subjects, or the neglecting to do a thing which the common good requires. Common nuisances are such inconvenient and troublesome offenses as annoy the whole community in general, and not merely some particular person." (4 *Black. Com.* 166.) There are certain things which are nuisances *per se*, of which a ditch dug, or a fence placed across a public highway, or an obstruction put in the bed of a navigable stream, are examples. So are vessels, clothes and goods charged with the effluvium and infection of persons fatally diseased ; also dead, decaying and putrid animal or vegetable matter. The class of which these last are examples are nuisances of themselves. They affect the public health, and may be suppressed and removed without serious or permanent injury to the owners of them. Their presence in cities and populous places may become the subject of municipal and sanitary regulation. The subdivision of the 14th section of the statute confers upon the boards of health the power to make regulations for the suppression and removal of nuisances, and the act must therefore be construed to have reference to that class of nuisances which can be the subject of regulation. There are certain things and employments which become nuisances not from any inherent and intrinsic

Rogers *v.* Barker.

offensive qualities of their own, but from matter extrinsic, such as the manner in which those things are used, and the manner and place where the occupations and employments are conducted. Certain trades which are entirely inoffensive in one place, may become nuisances when carried on in another. Neither a dam thrown across a stream of water, nor a collection of water in a reservoir created thereby, is a nuisance *per se*. On the contrary, they are sources of mechanical power, and tend to diffuse health and strength and comfort to large numbers of people. Reservoirs and collections of water by means of dams in the beds of running streams, for the purposes of manufactures and supplying cities and towns with water for public and domestic uses, are to be found every where throughout the state. They are ranked among the evidences of its civilization and progress in the useful arts. The water thus collected cannot in itself become detrimental and dangerous to the health of the population in the vicinity without other things combined, such as the presence of decayed and decaying vegetation, and its exposure in shallow basins to the evaporations of the summer heats. The question of nuisance or no nuisance depends upon the presence or absence of the extraneous facts and circumstances to which I have referred. Shall the decision of the boards of health that these extraneous facts and circumstances exist conclude the proprietors, and devote their property to destruction upon a three days' notice, without the opportunity to be heard ? Or shall not the existence of those facts, and the question of nuisance, be referred as it always has been, to the common law trial by jury ? It seems to me that there can be but one answer to this inquiry, and that is that the legislature never designed to commit this unusual measure of power to the boards of health. Besides, they are, as I have already said, " to make regulations in their discretion concerning the suppression and removal of nuisances." What sort of regulations can these boards make in regard to the numerous mill ponds, mill streams, mill dams, basins and reservoirs of water, spread over the surface

Rogers *v.* Barker.

of the state ?    Are they to prescribe their dimensions and depth, how much water they may safely contain, when they are to be drawn down, and when they may be refilled without detriment to the public health ?    It is manifest that this class of objects are not susceptible of the regulation contemplated by the statute, nor of any regulation consistent with the rights of property which the boards of health could prescribe.    The papers show, indeed it is not disputed, that the waters of the Mamaroneck river, by means of the dam and reservoir which it is the purpose of the defendants to remove, have been applied as a power for driving machinery for more than 60 years, with but little interruption.    They are still used for that purpose, and yield to the plaintiff a large annual rent.    These rights and privileges are property of the most valuable kind. The resolution of the defendants contemplates and intends nothing short of the total destruction of this property, without compensation to the owner, without notice of the proceedings by which it is devoted to destruction, without the judgment of any judicial tribunal, and without the due process of law mentioned in the 6th section of the 1st article of the constitution.    If the act in regard to boards of health is susceptible of any such construction, which it certainly is not, the judicial department of the government cannot suffer it to be executed.    The rights of property of every description are qualified and restricted by the rule that they shall be so exercised as not to injure others.    *Sic utero tuo ut alienum non lœdas,* is of universal application.    But except in great and imminent emergencies the fact that they are injurious to others must be first established by the usual and customary proceedings of a trial in a competent court, before they can be taken away or destroyed.

We have been referred to some authorities in our own courts, in affirmation of the powers claimed by the board of health. *Stuyvesant* v. *The Mayor &c. of New York,* (7 *Cowen,* 588,) affirmed the power of the mayor and common council to prohibit by their by-laws interments within certain parts of the

city, under a penalty even against persons having rights of interment by grant for more than a century, It was held that these rights of property must be held in subordination to the power of the local authorities to make regulations in respect to the public health. But the action was brought to recover the penalty, and did not involve the right of the corporation to destroy or remove property in a summary way. *Hart & Hoyt* v. *The Mayor, Aldermen and Commonalty of the City of Albany,* (9 *Wend.* 571,) affirmed the power of the corporation to remove from the basin in front of that city a floating store house for receiving and delivering goods which the plaintiffs had moored therein without grant, which permanent appropriation and exclusive occupation of a portion of a public river the court of errors held to be a public nuisance which might be removed and abated without indictment. This permanent obstruction in a navigable river or basin was a nuisance *per se.* The case of *Van Wormer* v. *The Mayor &c. of Albany,* (15 *Wend.* 262,) was an action of trespass for tearing down the barn and sheds of the plaintiff. The defendants justified under a by-law of the corporation reciting that the grounds upon which the buildings stood had been adjudged by the board of health to be a nuisance dangerous to the health and lives of the inhabitants. The removal was made during the prevalence of the Asiatic cholera, in the summer of 1832. The circuit judge decided that the justification was made out, upon the trial; whereupon the plaintiff submitted to a nonsuit which he afterwards moved to set aside. The case, in some of its aspects, resembles the present; but it will be seen that the principal question presented here did not arise, or if it did, was not examined and decided. Chief Justice Savage, in the opinion denying the motion to set aside the nonsuit, says: " Although no technical notice was given for the plaintiff to show cause, at the time when the premises were adjudged a nuisance, yet he had often had notice substantially; had appeared before the board and admitted the character of the premises and the necessity for digging them down, but

contended it should not be done at his expense, as he was but lessee." The case came up for re-examination in the court of errors, (18 Wend. 169.) The chancellor delivered the opinion, and he held that under the pleadings the plaintiff had no right to dispute the existence of the nuisance, which he said no one thought of denying. The case of Meeker v. Van Rensselaer, (15 Wend. 397,) was also an action of trespass for pulling down five dwelling houses in the city of Albany during the prevalence of the Asiatic cholera in 1832. The premises were originally erected as a tan house, 70 feet long by 12 high, and was divided into apartments and inhabited by some fifty emigrants. Beneath the floors of the building were twenty tan vats, filled with stagnant putrid water, which oozed through the floors. The premises were otherwise in a most filthy and offensive condition, and some of the inmates were dead, and others dying, at the time the building was taken down. The defendant justified under an order of the board of health of the city, declaring the premises a nuisance, and directing it should be abated. He had a verdict, which the plaintiff afterwards moved to set aside. The grounds of the motion related to exceptions taken to the decisions of the judge in regard to the evidence. The question of nuisance did not arise. Chief Justice Savage says, in rendering his opinion, "It was not denied upon the trial that the building torn down was a common nuisance, nor was it upon the argument." None of these cases determine the question presented on this appeal, and we have not been referred to any that does. One conclusion, I think, may be safely adopted, that if the power asserted in the defendant's resolution really exists, and can be applied to the removal and destruction of property like that described in the complaint in this action, it is a power which must be exercised in subordination to the judicial authority of the state, and subject to be suspended and held in abeyance by the order of a court having jurisdiction of the subject, whenever the principal facts upon which its exercise depends are put in controversy and rendered doubtful, until they are established by due

process of law. This is precisely the ground upon which the order of injunction at the special term was granted.

It should be affirmed with ten dollars costs.

[DUTCHESS GENERAL TERM, May 14, 1860. *Lott, Emott* and *Brown*, Justices.]